**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| TASHEBA BARNETT, ADELE HOFFMAN, and CHADAELA LOVINCEY, individually and on behalf of all others similarly situated, | } Civil Action Number: 1:22-cv-544 |
| | } District Judge Douglas R. Cole |
| Plaintiffs, | } Magistrate Judge Karen L. Litkovits |
| v. | } SECOND AMENDED CLASS ACTION COMPLAINT |
| THE KROGER COMPANY d/b/a Simple Truth Organic, HARRIS TEETER, LLC, HARRIS TEETER SUPERMARKETS, INC., and FRED MEYER, INC. | } JURY TRIAL DEMANDED |
| Defendants. | } |

Plaintiff Tasheba Barnett, Adele Hoffman, and Chadaela Lovincey (collectively, the "Plaintiffs"), by and through their attorneys, individually and behalf of all others similarly situated, bring this action against Harris Teeter, LLC, The Kroger Company, Fred Meyer, Inc., and Harris Teeter Supermarkets, Inc. (collectively, the "Defendants"). Plaintiffs allege, as and for their Second Amended Class Action Complaint, the following based on personal knowledge as to their own acts and based upon the investigation conducted by their counsel as to all other allegations.

## INTRODUCTION

1. Parents like Plaintiffs reasonably trust Defendants to sell baby food that is safe, nutritious, and free from harmful toxins. They certainly expect the food they feed their infants to not contain elevated levels toxic heavy metals such as arsenic, lead, cadmium, and mercury—substances known to have significant and dangerous health consequences, particularly for infants.

2. Unfortunately, Defendants' "Simple Truth Organic Rice Rusks Baby Teething Wafers" (the "Products") feature dangerous levels of arsenic, lead, cadmium, and mercury.

3. Consumers lack the scientific knowledge and resources necessary to identify the Products as containing dangerous quantities of these toxins. Reasonable consumers therefore must and do rely on Defendants to honestly report what their products contain.

4. Defendants know that their customers trust the quality of their products and that they reasonably expect Defendants' products to be safe for consumption. They also know that certain consumers seek out and wish to purchase premium baby foods that possess high quality ingredients free of toxins, contaminants, or chemicals and that these consumers will pay more for baby foods they believe possess these qualities than for baby foods they do not believe possess these qualities.

5. As such, the Products' packaging centers on representations and pictures that are intended to, and do, convey to consumers that the Products possess certain qualities and characteristics that render them safe for infants and justify a premium price.

6. No reasonable consumer seeing the Products' packaging would expect the Products to contain elevated levels of toxic heavy metals or other undesirable toxins or contaminants. Furthermore, reasonable consumers, like Plaintiffs, would consider the quantity of toxic heavy metals or other undesirable toxins or contaminants a material fact when considering what baby food to purchase.

7. Defendants intended for consumers to rely on their representations, and reasonable consumers did in fact so rely.

8. Defendants' conduct is deceptive, misleading, unfair, and/or false because, among other things, the Defendants failed to reveal that their Products include elevated levels of toxic heavy metals.

9. Defendants' Products do not have a disclaimer regarding the presence of elevated levels of heavy metals or other undesirable toxins or contaminants that would inform consumers that the

foods contain dangerous quantities of heavy metals and/or that heavy metals can accumulate over time in a child's body to the point where poisoning, injury, and/or disease can occur.

10. Because of Defendants misrepresentations as to safety and its material omissions and concealment about the levels of toxic metals, Plaintiffs not only purchased the Products but paid premium prices for the Products which they would not have paid if the truth had been disclosed and not concealed to them by Defendants.

11. Defendants' wrongful misrepresentations and omissions allowed them to capitalize on, and reap enormous profits from, Plaintiffs and the Class Members—who paid the purchase price and a price premium for contaminated baby food that was not sold as advertised.

12. Defendants continue to wrongfully induce consumers to purchase their Products which are not as advertised or as customers would reasonably expect.

13. Plaintiffs bring this proposed consumer class action individually and on behalf of all other members of the Class (as defined herein), who, from the applicable limitations period up to and including the present, purchased for use and not resale the Products.

## JURISDICTION, VENUE, AND GOVERNING LAW

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because: (i) there are 100 or more class members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) Plaintiffs and Defendants are citizens of different states. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

15. Venue is proper in this Court pursuant to 28 U.S.C. §1391, because Plaintiffs suffered injury as a result of Defendants' acts in this district, many of the acts and transactions giving rise to this action occurred in this district, Defendants conduct substantial business in this district, and

The Kroger Company is headquartered in this district. Defendants have intentionally availed themselves of the laws and markets of this district, and Defendants are subject to personal jurisdiction in this district.

16. This Court has personal jurisdiction over the Defendants because they conduct substantial business in this judicial district, and intentionally and purposefully placed the Products into the stream of commerce within this district and throughout the United States.

17. Each of the Plaintiff has suffered an actual and concrete injury in fact as a result of the conduct of Defendants alleged herein in that said misrepresentations and material omissions caused them to purchase the Defendants' products for a price premium that they would not have paid otherwise.

**PARTIES**

18. Tasheba Barnett is a resident of Fort Worth, Texas, who purchased the Products for consumption and not resale.

19. Adele Hoffman is a resident of Michigan City, Indiana, who purchased the Products for consumption and not resale.

20. Chadaela Lovincey is a resident of Lynnwood, Washington, who purchased the Products for consumption and not resale

21. Defendant Harris Teeter, LLC, is a limited liability company with its principal office in Matthews, North Carolina. Harris Teeter distributes self-proclaimed natural and organic foods via their brands Simple Truth and Simple Truth Organic, throughout the United States.

22. Harris Teeter, LLC, distributes products through the trade name Simple Truth Organic including baby food products, like the Products, for children of various ages.

23. Harris Teeter Supermarkets, Inc., is a North Carolina corporation with its principal place of business in Matthews, North Carolina. Upon information and belief Harris Teeter Supermarkets, Inc., sells the Products directly to consumers from its various retail locations throughout the United States.

24. Fred Meyer, Inc., a subsidiary of The Kroger Company, is a Delaware Corporation with its principal place of business in Portland, Oregon. Fred Meyer, Inc., is an American chain of hypermarket superstores founded in 1931 in Portland, Oregon, by Fred G. Meyer.

25. Fred Meyer, Inc., distributes products through the trade name Simple Truth Organic including baby food products, like the Products, for children of various ages.

26. The Kroger Company is an Ohio Corporation with its principal place of business in Cincinnati, Ohio. The Kroger Company, directly or indirectly, owns a controlling interest in Harris Teeter Supermarkets, Inc, Harris Teeter, LLC, and Fred Meyer, Inc. Moreover, The Kroger Company obtains and distributes the Defendants' products identified by the trade names Simple Truth and Simple Truth Organic, including the Products.

## CLASS ACTION ALLEGATIONS

27. Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class of similarly situated individuals who purchased the dangerous Products during the proposed class period.

28. Specifically, the Class and Subclasses that the Plaintiffs seek to represent are defined as follows:

> **Nationwide Class**: All individuals who purchased, for use and not resale, the Products within the United States in the past four years.
>
> **Indiana Subclass**: All individuals who purchased, for use and not resale, the Products within the State of Indiana in the past four years.

> **Texas Subclass**: All individuals who purchased, for use and not resale, the Products within the State of Texas in the past four years.
>
> **Washington Subclass**: All individuals who purchased, for use and not resale, the Products within the State of Washington in the past four years.

29. Plaintiffs further allege additional Subclasses for individuals in combinations of other States, territories, and possessions to the extent Class Members from jurisdictions can be grouped together for purposes of class treatment given that Rule 23 and choice of law principles permit certification of subgroups of states and provide that relatively minor differences in state law that can be overcome by grouping similar laws together. *See also*, *e.g.*, *Phillips Petro. Co. v. Shutts*, 472 U.S. 797, 816 (1985) ("[t]here can be no injury in applying Kansas law if it is not in conflict with that of any other jurisdiction connected to this suit").

30. Specifically excluded from the Class and Subclasses are Defendants and any and all of their respective affiliates, legal representatives, heirs, successors, employees, or assignees.

31. This action has been brought and may properly be maintained as a Class Action under Federal Law and satisfies the numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

32. The members of the Class and Subclasses are so numerous as to render joinder impracticable. Upon information and belief, there are thousands of Products sold – most, if not all, of the purchasers of the Products are members of the Proposed Class and Subclasses. Upon information and belief, the size of the Proposed Class and Subclasses totals at least thousands of individuals.

33. Upon information and belief, joinder of all of these individuals is impracticable because of the large number of Class Members and the fact that Class Members are likely dispersed over a large geographical area, with members residing throughout the United States.

34. Common questions of law and fact exist as to all members of the Class and Subclasses, in that all members of the class and Subclasses purchased the Products, which contain dangerous levels of toxic metals, from the Defendants.

35. Plaintiffs' claims are typical of the claims of the members of the Class and Subclasses. Plaintiffs and all members of the Class and Subclasses sustained damages arising out of Defendants' course of conduct. The harms suffered by the Plaintiffs are typical of the harms suffered by the members of the Class and Subclasses.

36. The representative Plaintiffs have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the Class and Subclasses. Plaintiffs have no interests that are adverse to the interests of the members of the Class and Subclasses.

37. Plaintiffs have retained counsel with substantial experience in the prosecution of class action and consumer protection litigation. Plaintiffs' counsel has the resources, expertise, and experience to successfully prosecute this action against Defendants. Counsel for the Plaintiffs knows of no conflicts among members of the Class and Subclasses, or between counsel and members of the Class and Subclasses.

38. This action, in part, seeks declaratory and injunctive relief. As such, the Plaintiffs seek Class Certification under Fed. R. Civ. P. 23(b)(2), in that all Members of the Proposed Class and Subclasses were subjected to the same policies, concealment, and actions of the Defendants. In short, Defendants acted on grounds generally applicable to all members of the Class and Subclasses.

39. In addition to certification under Rule 23(b)(2), and in the alternative, Plaintiffs seek certification under Rule 23(b)(3). Common questions of law and fact exist as to all members of

the Class and Subclasses, and predominate over any questions that affect only individual member of the class. These common questions include, inter alia, the following questions:

a) Whether Defendants engaged in the conduct discussed herein;

b) Whether the Products contain dangerous levels of toxins;

c) Whether the presence of elevated levels of toxic metals is material to a reasonable consumer;

d) Whether Defendants placed the Products in the stream of commerce in the United States with knowledge of the elevated levels of toxins contained within;

e) Whether Defendants knew or should have known about the presence of elevated quantities of toxic metals and, if so, when Defendants became aware of their existence;

f) Whether Defendants knowingly failed to disclose the existence and cause of the elevated toxin levels;

g) Whether Defendants violated consumer protection statutes;

h) Whether Plaintiffs and Class overpaid for the Products;

i) Whether Plaintiffs and Class Members are entitled to damages as a result of Defendants' conduct alleged herein, and if so, the amount or proper measure of those damages; and

j) Whether Plaintiffs and Class Members are entitled to equitable relief, including but not limited to injunctive relief, including public injunctive relief as provided under Ohio, Indiana, Texas, and Washington law.

40. In the alternative to certification under Fed. R. Civ. P. 23(b)(3), Plaintiffs also seek partial certification under Fed. R. Civ. P. 23(b)(1) and Fed. R. Civ. P. 23(c)(4).

41. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all of the individual members of the Class and Subclasses is impracticable given the large number of members of the Class and Subclasses, and the fact they are dispersed throughout the United States. Furthermore, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the Class and Subclasses to redress the wrongs done to them. The cost to the federal court system of adjudicating thousands of individual cases would be enormous. Individualized litigation would also magnify the delay and expense to all parties and the court system. By contrast, the conduct of this action as a class action in this District presents far fewer management difficulties, conserves the resources of the parties and the court system, and protects the rights of each member of the Class and Subclasses.

42. Upon information and belief, there are no other class actions pending to address the Defendants' flagrant endangerment of the public health of thousands of infants, even though upon information and belief the Defendants have maintained their dangerous and illegal practices for several years.

## **FACTS**
### **Facts Applicable to the Class**

43. Arsenic, lead, cadmium, and mercury are toxic heavy metals whose ingestion poses risks to human health. Moreover, scientific studies and reports including those conducted and released by the United States Food and Drug Administration ("FDA") particularly point to the severe effects exposure to these heavy metals may have on young children and babies. The FDA states that children's "smaller body sizes and metabolism" may make them more susceptible to the

negative impacts of the metals including on "neurological development." [1] There is no *safe* amount for a baby to ingest and the FDA, accordingly, launched a *Closer to Zero* campaign aiming to minimize exposure of these metals to babies and young children.[2] This campaign came in response to a report released by the U.S. House of Representatives about heavy metals found in popular baby foods.

44. On February 4, 2021, the U.S. House of Representatives Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, released a report entitled, *Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* (hereinafter "Report").[3] The Report exposed many of the largest name brand baby food manufacturers, part of a billion-dollar industry, of knowingly concealing dangerous levels of contamination in ingredients directly used in the production of their baby food products. It flags a causative relationship between exposure to arsenic, lead, cadmium, and/or mercury and severe, lasting impacts on babies and young children such as "permanent decreases in IQ, diminished future economic productivity, and increased risk of future criminal and antisocial behavior in children."[4]

45. The Report revealed that contaminated ingredients along the supply chain were disregarded by certain manufacturers who, in releasing their contaminated final products, failed to safeguard and warn consumers of the concentrated presence of these toxic heavy metals. Federal

---

[1] U.S. Food & Drug Admin., *Environmental Contaminants in Food* (Dec. 18, 2023), https://www.fda.gov/food/chemical-contaminants-pesticides/environmental-contaminants-food (last accessed July 19, 2024) (previously located in *Metals and Your Food* (Aug. 24, 2020), https://www.fda.gov/food/chemicals-metals-pesticides-food/metals-and-your-food, now archived at https://web.archive.org/web/20210216200550/https://www.fda.gov/food/chemicals-metals-pesticides-food/metals-and-your-food).

[2] U.S. Food & Drug Admin., *FDA Releases Action Plan for Reducing Exposure to Toxic Elements from Foods for Babies, Young Children* (Apr. 8, 2021), https://www.fda.gov/news-events/press-announcements/fda-releases-action-plan-reducing-exposure-toxic-elements-foods-babies-young-children (last accessed July 19, 2024).

[3] H.R. Subcomm. on Econ. & Consumer Pol'y, Comm. on Oversight and Reform, *Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* (Feb. 4, 2021), https://oversightdemocrats.house.gov/news/press-releases/oversight-subcommittee-staff-report-reveals-top-baby-foods-contain-dangerous (last accessed July 19, 2024).

[4] *Id.*

limits on *safe* levels of heavy metal concentration in relation to baby food, as mentioned above, do not exist. However, for comparison, the Report states that the FDA sets adult limits for bottled drinking water "at 10ppb inorganic arsenic, 5 ppb lead, 5ppb cadmium, and the Environmental Protection Agency has capped…mercury…at 2ppb."[5] The subcommittee's Report goes on to describe the specific risks to children posed by each of these toxic heavy metals.

***Arsenic***

46. Arsenic's most notable impacts on young children's health include "respiratory, gastrointestinal, hematological, hepatic, renal, skin, neurological and immunological effects, as well as damaging effects on the central nervous system and cognitive development in children."[6] Though the FDA set a 10ppb limit for arsenic in water consumed by adults, some studies have found notable detrimental effects to children at levels as low as 5ppb.[7] Whatever the level, there is no question about the scientific consensus that arsenic is unhealthy for human consumption, particularly for the most vulnerable among us, including children and babies.

***Lead***

47. Similarly, the FDA mandated a 5ppb cap on lead allowable in drinking water on account of negative human health outcomes. In the same way arsenic poses a heightened risk to vulnerable populations, the FDA reports:

> High levels of lead exposure can seriously harm children's health and development, specifically the brain and nervous system. Neurological

---

[5] *Id.*

[6] Miguel Rodríguez-Barranco et al., *Association of Arsenic, Cadmium and Manganese Exposure with Neurodevelopment and Behavioural Disorders in Children: A Systematic Review and Meta-Analysis*, 454-455 Science of The Total Environ. 562-577 (2013), https://pubmed.ncbi.nlm.nih.gov/23570911/ (last accessed July 19, 2024).

[7] Gail A. Wasserman et al., *A Cross-Sectional Study of Well Water Arsenic and Child IQ in Maine Schoolchildren*, 13 *Env't Health* 23 (2014), https://ehjournal.biomedcentral.com/articles/10.1186/1476-069X-13-23 (last accessed July 19, 2024).

> effects from high levels of lead exposure during early childhood include learning disabilities, behavior difficulties, and lowered IQ.[8]

48. Moreover, lead, unlike arsenic, is capable of accumulation in the body which means that unknowingly consuming even low amounts of the toxin over time may exacerbate already heightened risks.[9] The Report additionally expounds on various studies' evidence of permanent developmental delays in socialization and academic success as a result of lead exposure.

***Cadmium***

49. Cadmium, much like lead, has been linked to decreased IQ, but also is found to have high correlations with increased instances of ADHD, especially in young boys.[10] The research on cadmium exposure and negative health outcomes for young children and babies in particular, has been nothing short of conclusive in revealing its severity. The FDA's limit of 5ppb in adult drinking water appropriately flags this concern, though harmful exposure to children may occur at even lower levels.

***Mercury***

50. Finally, mercury exposure has known detrimental impacts on IQ as well and is correlated with diagnoses of autism in children.[11] The Report notes that subjection to contact with mercury, despite having been studied most often prenatally, has clear implications on the health of any continually developing child out of the womb as much as in. The EPA's limit of 2ppb on

---

[8] U.S. Food & Drug Admin., *Lead in Food, Foodwares, and Dietary Supplements* (June. 29, 2022), archived at https://web.archive.org/web/20221002073240/www.fda.gov/food/metals-and-your-food/lead-food-foodwares-and-dietary-supplements (last accessed July 19, 2024).

[9] *Id.*

[10] H.R. Subcomm. on Econ. & Consumer Pol'y, Comm. on Oversight and Reform, *Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* (Feb. 4, 2021), https://oversightdemocrats.house.gov/news/press-releases/oversight-subcommittee-staff-report-reveals-top-baby-foods-contain-dangerous (last accessed July 19, 2024).

[11] Jia Ryu et al., *Associations of Prenatal and Early Childhood Mercury Exposure with Autistic Behaviors at 5 Years of Age: The Mothers and Children's Environmental Health (MOCEH) Study*, 605-606 Science of The Total Environ. 251-257 (2017), www.sciencedirect.com/science/article/pii/S0048969717316479 (last accessed July 19, 2024).

mercury in drinking water is the lowest allowable level of these four heavy metals and indicates that minimizing mercury exposure at all levels is of the utmost importance.

**<u>THE SALE OF BABY FOOD CONTAMINATED WITH HEAVY METALS IS A DECEPTIVE PRACTICE</u>**

51. Each of the preceding paragraphs is incorporated by reference herein.

52. Advertisements, packages, and labels should provide consumers with accurate information as to the nature and quality of a product's contents and is essential to making informed decisions. When a company misrepresents material information about a product, it is deceptive and misleading to reasonable consumers.

53. On its website and on every Product's packaging, Defendants prominently represent that the Products are intended as safe and healthy snacks for babies and young children. Nowhere on the label or description of the Products are there any indication that it would or could be laced with toxic heavy metals, decidedly detrimental to a child's health and well-being.






54. Independent laboratory testing[12] revealed for example that the Apple & Kale variety of the Products contained 45.5ppb arsenic, 13.1 ppb cadmium, 6.5ppb lead, and more than 1.7 ppb mercury. Each of these elevated levels are high enough to raise significant concern, *see supra*, and all are contrary to the prominent representations on the Products' packaging and in Defendants' advertising and promotional materials.

55. Defendants' sale of the Products deceives consumers because the front of the package touts the absence of any possibility that the Products could have a dangerous impact on a child who may consume them. Moreover, the Products' packaging omits any mention that they contain elevated levels of these toxins.

56. Defendants' advertising additionally deceives consumers by stating that the Products are a "high quality," "product you can trust," "perfect snack for tiny tummies," safe and

[12] Attached as Exhibit A is a partly-redacted Certificate of Analysis with the results of independent laboratory tests conducted on the subject Products purchased from Defendants' stores.

recommended for children "6+ months," and specifically catered to nutritional value for "a child less than one year of age."

57. Defendants' misrepresentations and omissions were made knowingly because Defendants were in a position to know through their internal quality control and product safety personnel that are charged with the responsibility to ensure that products sold are safe and are as represented, and did in fact know, both where their own Products came from and the contents of their Products. In addition, the Products supplier regularly conducted testing which demonstrated elevated toxic metal levels of the Products and each Defendant either possessed such tests or should have satisfied itself by either contemporaneously requesting copies of the tests or by running sample tests itself periodically through its internal quality control and product safety personnel which good manufacturing and procedures for retail sales of food products to consumers required of Defendants.

58. Accordingly, Defendants were in a position to know, and did in fact know, both where their own Products came from and the contents of their Products.

59. Defendants' knowledge of the issue was supplemented by the Report.

60. Defendants' sale of the Products is deceptive to reasonable consumers, because there is no practical way for them to know prior to purchase that the Products are laden with heavy metals despite being marketed as safe, even and especially for babies.

## **Facts Applicable to Named Plaintiffs**

### I. **Tasheba Barnett**

61. Plaintiff Barnett purchased the Products, specifically Simple Truth Organic Rice Rusks Carrot and Strawberry Baby Teething Wafers and Simple Truth Organic Rice Rusks Apple and Sweet Potato Baby Teething Wafers, from local Kroger grocery stores. Plaintiff Barnett fed the

Products to her child between December 2019 and May 2021. She fed the Products to her 2-year-old child daily and sometimes a few times a day.

62. Plaintiff Barnett believed that she was feeding her children healthy, nutritious food by feeding her child the Products. She fears that her child who consumed the Products will experience adverse health effects as a result of frequently consuming the Products as a young child. Due to the false and misleading claims and omissions by Defendants, Plaintiff Barnett was unaware the Products contained elevated level of toxic heavy metals and would not have purchased the Products had that information been fully disclosed.

63. Plaintiff Barnett would not have purchased the Products at the premium price she did if she had known that the Products contained elevated level of toxic heavy metals which were material to a reasonable consumer acting reasonably.

**II. <u>Adele Hoffman</u>**

64. Plaintiff Hoffman purchased the Products, specifically the Simple Truth Organic Rice Rusks Carrot and Strawberry Baby Teething Wafers, Simple Truth Organic Rice Rusks Apple and Sweet Potato Baby Teething Wafers from local Kroger grocery stores. Plaintiff Hoffman fed the Products to her 3-year-old and 5-year-old, from approximately August 2017 to June 2021. During this time frame, Plaintiff Hoffman generally fed the Products to her children a few times a day.

65. Plaintiff Hoffman believed she was feeding her children healthy, nutritious food by feeding her children the Products. Due to the false and misleading claims and omissions by Defendants, Plaintiff Hoffman was unaware the Products contained elevated level of toxic heavy metals and would not have purchased the Products had that information been fully disclosed.

66. Plaintiff Hoffman would not have purchased the Products at the premium price she did if she had known that the Products contained elevated level of toxic heavy metals which were material to a reasonable consumer acting reasonably.

**III. <u>Chadaela Lovincey</u>**

67. Plaintiff Lovincey purchased the Products, specifically Simple Truth Organic Rice Rusks Carrot and Strawberry Baby Teething Wafers and Simple Truth Organic Rice Rusks Apple and Sweet Potato Baby Teething Wafers from local Fred Meyer grocery stores. Plaintiff Lovincey fed the Products to her two-year-old child from May 2020 to March 2022. She fed the Products to her child daily and sometimes a few times a day.

68. Plaintiff Lovincey believed that she was feeding her child healthy, nutritious food by feeding her child the Products. She fears that her child who consumed the Products will experience adverse health effects as a result of frequently consuming the Products as a young child. Due to false and misleading claims and omissions by Defendant, Plaintiff Lovincey was unaware the Products contained elevated level of toxic heavy metals and would not have purchased the Products had that information been fully disclosed.

69. Plaintiff Lovincey would not have purchased the Products at the premium price she did if she had known that the Products contained elevated level of toxic heavy metals which were material to a reasonable consumer acting reasonably.

## <u>CAUSES OF ACTION</u>

### <u>COUNT I</u>
### Common Law Breach of Implied Warranty
### Ohio Common Law
### (Asserted on behalf of the Nationwide Class / Asserted in the Alternative on behalf of the State Subclasses)

70. Plaintiffs repeat and reallege each of the prior paragraphs above as if fully stated herein.

71. Plaintiffs assert a breach of implied warranty claim under Ohio state law.

72. Defendants are merchants and were at all relevant times involved in the sourcing, distributing, warranting, and/or selling of the Products. Defendants knew or had reason to know of the specific use for which the Products, as goods, are purchased.

73. Defendants distributed or sold its Products to Class Members.

74. Defendants provided Plaintiffs and Class Members with implied warranties that the Products are merchantable and fit for the ordinary purposes for which they are used and sold and are not otherwise injurious to consumers.

75. However, the Products are not fit for their ordinary purpose of providing reasonably safe nourishment to infants because the Products are contaminated with dangerous levels of toxic metals. The dangerously elevated levels render the Products uniquely inappropriate for consumption by highly vulnerable infants.

76. The dangerous levels of toxins in the Products render them unsafe for infants, their intended consumers. Therefore, the Products are not merchantable.

77. Defendants either sold the Products directly to consumers or distributed the Products to a co-Defendant in order to sell the Products directly to consumers. Defendants' warranties were designed for and intended to benefit the consumer only. At all times, Plaintiffs and Class Members were the Defendants' intended beneficiaries.

78. Defendants impliedly warranted that the Products were of merchantable quality and fit for their intended consumption by infants. These implied warranties included, among other things, that Defendants' Products were safe and fit for consumption by infants.

79. Contrary to the applicable implied warranties, the Products were not fit for the ordinary and intended purpose of providing safe nourishment to infants. Instead, the Products host elevated levels of dangerous toxic metals.

80. Defendants' sale of dangerous baby food caused the implied warranty to fail in its essential purpose.

81. Defendants breached the implied warranties because the Products were sold containing dangerous levels of toxic metals, which prevented them from being safe for consumption by infants.

82. Defendants knew or had a duty to know about the levels of toxins in their own products. Any efforts to limit the implied warranties in a manner that would exclude coverage of the Products is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Products is null and void.

83. As a direct and proximate result of the foregoing, Plaintiffs and Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

84. Alternatively to the cause of action of breach of Implied Warranty under Ohio law, and to the extent the Court deems it necessary, Plaintiffs assert herein subclasses for each state, including an Indiana Subclass, Washington Subclass and Texas Subclass with respect to the breach of Implied Warranty Count and thereby assert claims for breach of Implied Warranty for each state subclass under the respective laws of Indiana, Washington and Texas on behalf of purchasers of the Products within each state. Plaintiffs further allege additional Subclasses for individuals in other States, territories, and possessions to the extent Class Members from jurisdictions can be grouped together for purposes of class treatment given that Rule 23 and choice of law principles

permit certification of subgroups of states and provide that relatively minor differences in state law that can be overcome by grouping similar laws together.

**<u>COUNT II</u>**
**Unjust Enrichment/Restitution**
**Ohio Common Law**
**(Asserted on behalf of the Nationwide Class / Asserted in the Alternative on behalf of the State Subclasses)**

85. Plaintiffs repeat and reallege each of the prior paragraphs above as if fully stated herein.

86. Plaintiffs assert the within unjust enrichment claim under Ohio state law.

87. Defendants have been unjustly enriched as a result of the conduct described in this Complaint.

88. Defendants received a benefit from Plaintiffs and the members of the Nationwide Class and State Subclasses in the form of payment for the Products.

89. Retention of these benefits by Defendants would be unjust and inequitable because Defendants received these benefits by engaging in the unlawful, unjust, and wrongful acts, omissions, and practices described in this Complaint.

90. The benefits (or at least some portion the benefits) that Defendants received were not legitimately earned and came at the expense of Plaintiffs and the other members of the Nationwide Class and State Subclasses.

91. Defendants knew or should have known that the Products can physically harm the infants that they are purchased for, but nonetheless continues to sell the Products without warning.

92. Defendants' conduct is unjust, inequitable, and wrongful, but systematically engage in this conduct anyway in order to gain unfair advantages and reap unearned financial benefits.

93. There is no justification for Defendants' continued silence as customers purchased the contaminated and dangerous Products.

94. It is therefore against equity and good conscience to permit Defendants to retain the proceeds from their sales of the dangerous Products.

95. Plaintiffs and the Nationwide Class are entitled to restitution and disgorgement of all amounts unjustly retained by Defendants, as well as other appropriate relief.

96. Alternatively to the cause of action for Unjust Enrichment under Ohio law, and to the extent the Court deems it necessary, Plaintiffs assert herein subclasses for each state, including an Indiana Subclass, Washington Subclass and Texas Subclass with respect to the claim of unjust enrichment and thereby assert claims of unjust enrichment for each state subclass under the respective laws of Indiana, Washington and Texas on behalf of purchasers of the Products within each state.

## COUNT III
**Texas Deceptive Trade Practices and Consumer Protection Act**
**Tex. Bus. & Com. Code §§ 17.41 et seq.**
**(Asserted on behalf of Plaintiff Barnett and the Texas Subclass)**

97. Plaintiff Barnett repeats and realleges each of the prior paragraphs above as if fully stated herein.

98. Plaintiff Barnett and the Texas Subclass asserts a claim under the Texas Deceptive Trade Practices and Consumer Protection Act ("TDTPA") against Defendant.

99. On August 15, 2022, Plaintiff Barnett provided Defendants written notice of the specific complaint and damages to Defendants in accordance with Tex. Bus. & Com. Code § 17.505. More than the requisite 60 days have passed since this notice was provided to Defendants and Defendants have not agreed to resolve any claims asserted which are brought pursuant to the TDTPA and, as a result, the within claim is properly asserted subsequent to the pre-suit notice provided to Defendants.

100. Plaintiff Barnett and Texas Subclass Members are residents of the State of Texas.

101. Plaintiff Barnett is a “consumer” as defined by the by the TDTPA.

102. At all material times herein, Defendants engaged in "trade" or "commerce" in as defined by the TDTPA.

103. Defendants do not fall under any of the exemptions laid out under Tex. Bus. & Com. Code § 17.49, and can therefore be sued under the TDTPA.

104. The TDTPA, Tex. Bus. & Com. Code § 17.46, makes it unlawful to commit "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce."

105. Defendants violated the TDTPA by, among other things:

a. “representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;”

b. “advertising goods or services with intent not to sell them as advertised;” and

c. “failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed”

106. As explained above, Defendants further violated the TDTPA by breaching both express and implied warranties.

107. For the reasons discussed herein, Defendants also violated and continues to violate the TDTPA by engaging in the herein described unconscionable, deceptive, unfair acts or practices proscribed by TDTPA §§ 17.41 et seq. Defendants' acts and practices, including their material omissions, described herein, were likely to, and did in fact, deceive, and mislead members of the public, including Texas consumers acting reasonably under the circumstances, to their detriment.

108. Defendants repeatedly advertised, both on the labels for the Products, on their websites, and through a national advertising campaign, among other items, that the Products were and are safe and healthy for infant and child consumption. Defendants failed to disclose the material information that the Products contained unsafe levels of toxic heavy metals and were, in fact, not suitable for infant and child consumption.

109. Defendants' misrepresentations and omissions were made knowingly because Defendants were in a position to know, and did in fact know, both where their own Products came from and the contents of their Products.

110. Despite Defendants' knowledge of the issue being supplemented by the Report, Defendants continued to sell the Products to Plaintiff Barnett and members of the Texas Subclass.

111. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase the Products without being aware that the Products contained unsafe levels of toxic heavy metals. As a direct and proximate result of Defendants' unfair and deceptive acts or practices, Plaintiff Barnett and the Texas Subclass Members suffered damages by purchasing the Products because they would not have purchased the Products had they known the truth, and they received products that were worthless because they contain unsafe levels of toxic heavy metals.

112. Defendants' deceptive trade practices caused injury in fact and actual damages to Plaintiff Barnett and Texas Subclass Members in the form of the loss or diminishment of value of the Products Plaintiff Barnett and Texas Subclass Members purchased, which allowed Defendants to profit at the expense of Plaintiff Barnett and Texas Subclass Members. The injuries to Plaintiff Barnett and Texas Subclass Members were to legally protected interests. The gravity of the harm

of Defendants' actions is significant and there is no corresponding benefit to consumers of such conduct.

113. Plaintiff Barnett and Texas Subclass Members seek relief for the injuries they have suffered as a result of Defendants' unfair and deceptive acts and practices, as provided by TDTPA and applicable law.

**COUNT IV**
**Indiana Deceptive Consumer Sales Act**
**Indiana Code § 24-5-0.5-1 to 12**
**(Asserted on behalf of Plaintiff Hoffman and the Indiana Subclass)**

114. Plaintiff Hoffman repeats and realleges each of the prior paragraphs above as if fully stated herein.

115. The purposes and policies of the Indiana Deceptive Consumer Sales Act (the "DCSA", Indiana Code § 24-5-0.5-1 to -12, are to:

a) simplify, clarify, and modernize the law governing deceptive and unconscionable consumer sales practices;

b) protect consumers from suppliers who commit deceptive and unconscionable consumer sales practices; and

c) encourage the development of fair consumer sales practice.

Ind. Code § 24-5-0.5-1(b).

116. The Indiana General Assembly has instructed courts to construe the DCSA liberally to promote these purposes and policies. Ind. Code § 24-5-0.5-1(a).

117. Defendants are each a "supplier" as defined in the DCSA because they are sellers or other persons who regularly engage in or solicit consumer transactions, which are defined to include sales of personal property, services, and intangibles that are primarily for a personal, familial, or household purpose, such as those at issue in this action. Ind. Code § 24-5-0.5-2(1), (3).

118. The DCSA provides that "[a] supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction. Such an act, omission, or practice by a supplier is a violation of [the DCSA] whether it occurs before, during, or after the transaction. An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations." Ind. Code § 24-5-0.5-3(a).

119. For the reasons discussed herein, Defendants violated and continues to violate the DCSA by engaging in the herein described unconscionable, deceptive, unfair acts or practices proscribed by DSCA § 24-5-0.5-3.

120. With regard to the fraudulent conduct by Defendants pursuant to Ind. Code § 24-5-0.5-2(8), the conduct and omissions alleged herein were done by Defendants, the suppliers of the defective products, as part of a scheme, artifice and/or device with the intent to mislead or defraud Plaintiffs and members of the putative class.

121. **Who**: the device, scheme and/or artifice was engaged in by each of the Grocery Stores, e.g., The Kroger Co., HarrisTeeter, LLC, Harris Teeter Supermarkets, Inc., and Fred Meyer, Inc.

122. **What**: Defendants knew that that customers trust the quality of their products that their consumers seek to purchase premium baby foods that possess high quality ingredients free of toxins, contaminants, or chemicals and that these consumers will pay more for baby foods they believe possess these qualities than for baby foods they do not believe possess these qualities. As such, the Products' packaging centers on misrepresentations and pictures that are intended to, and do, convey to consumers that the Products possess certain qualities and characteristics that render them safe for infants and justify a premium price.

123. **How:** No reasonable consumer seeing the Products' packaging would expect the Products to contain elevated levels of toxic heavy metals or other undesirable toxins or contaminants. Furthermore, reasonable consumers, like Plaintiffs, would consider the quantity of toxic heavy metals or other undesirable toxins or contaminants a material fact when considering what baby food to purchase. Defendants intended for consumers to rely on their representations, and reasonable consumers did in fact so rely. Defendants' conduct is deceptive, misleading, unfair, and/or false because, among other things, the Defendants failed to reveal that their Products include elevated levels of toxic heavy metals. Because of Defendants misrepresentations as to safety and its material omissions and concealment about the levels of toxic metals, Plaintiffs not only purchased the Products but paid premium prices for the Products which they would not have paid if the truth had been disclosed and not concealed to them by Defendants.

124. **Where:** Defendants fraud occurred at the place and state where they both designed and creqated the false and misleading advertising and where the consumers in Indiana purchased the Products which were at each Grocery Store location in Indiana. In the case of Planitiff Hoffman, she n purchased the Products, specifically the Simple Truth Organic Rice Rusks Carrot and Strawberry Baby Teething Wafers, Simple Truth Organic Rice Rusks Apple and Sweet Potato Baby Teething Wafers from her local Kroger grocery stores in Michigan City, Indiana.

125. **When:** Plaintiff Hoffman purchased the Product from Defendants during the time period August 2017 through June 2021.

126. Defendants' acts and practices, including its material omissions, described herein, were likely to, and did in fact, deceive, and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

127. Defendants repeatedly advertised, both on the labels for the Products, on their websites, and through a national advertising campaign, among other items, that the Products were and are safe and healthy for infant and child consumption. Defendants failed to disclose the material information that the Products contained unsafe levels of toxic heavy metals.

128. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase the Products without being aware that the Products contained unsafe levels of toxic heavy metals. As a direct and proximate result of Defendants' unfair and deceptive acts or practices, Plaintiff Hoffman and Indiana Subclass Members suffered damages by purchasing the Products because they would not have purchased the Products had they known the truth, and they received products that were worthless because they contain unsafe levels of toxic heavy metals.

129. Defendants' misrepresentations and omissions were made knowingly because Defendants were in a position to know through their internal quality control and product safety personnel that are charged with the responsibility to ensure that products sold are safe and are as represented, and did in fact know, both where their own Products came from and the contents of their Products. In addition, the Products' supplier regularly conducted testing which demonstrated elevated toxic metal levels of the Products and each Defendant either possessed such tests or should have satisfied itself by either contemporaneously requesting copies of the tests or by running sample tests itself periodically through its internal quality control and product safety personnel, which good manufacturing and procedures for retail sales of food products to consumers required from Defendants.

130. Despite Defendants' knowledge of the issue being supplemented by the Report, Defendants continued to sell the Products to Plaintiff Hoffman and members of the Indiana Subclass.

131. Plaintiff Hoffman would not have purchased the Products at the premium prices she did if she had known that the Products contained elevated level of toxic heavy metals which were material to a reasonable consumer acting

132. Defendants' deceptive trade practices caused injury in fact and actual damages to Plaintiff Hoffman and Indiana Subclass Members in the form of the loss or diminishment of value of the Products Plaintiff Hoffman and Indiana Subclass Members purchased, which allowed Defendants to profit at the expense of Plaintiff Hoffman and Indiana Subclass Members. The injuries to Plaintiff Hoffman and Indiana Subclass Members were to legally protected interests. The gravity of the harm of Defendants' actions is significant and there is no corresponding benefit to consumers of such conduct.

133. The DCSA provides that "[a] person relying upon an uncured or incurable deceptive act may bring an action for the damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater. The court may increase damages for a willful deceptive act in an amount that does not exceed the greater of: (1) three (3) times the actual damages of the consumer suffering the loss; or (2) one thousand ($1,000). Ind. Code § 24-5-0.5-4(a)

134. The DCSA provides that "[a]ny person who is entitled to bring an action under subsection (a) on the person's own behalf against a supplier for damages for a deceptive act may bring a class action against such supplier on behalf of any class of persons of which that person is a member . . . ." Ind. Code § 24-5-0.5-4(b).

135. Plaintiff Hoffman and Indiana Subclass Members seek relief for the injuries they have suffered as a result of Defendants' unfair and deceptive acts and practices, as provided by TDTPA and applicable law.

**<u>COUNT V</u>**
**Washington Consumer Protection Act**
**RCW §§ 19.86.010, *et seq.***
**(Asserted on behalf of Plaintiff Lovincey and the Washington Subclass)**

136. Plaintiff Lovincey repeats and realleges each of the prior paragraphs abpve as if fully stated herein.

137. Washington's Consumer Protection Act, RCW §§ 19.86.010, et seq. ("CPA"), protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

138. To achieve that goal, the CPA prohibits any person from using "unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce. . .." RCW § 19.86.020. An unfair or deceptive business practice is one that is likely to deceive a substantial portion of the public or otherwise affect public interest and includes the knowing omission of a material fact.

139. Plaintiff Lovincey and Washington Subclass Members are "consumers" within the meaning of the CPA.

140. Plaintiff Lovincey and Washington Subclass Members are residents of the State of Washington.

141. At all material times herein, Defendants engaged in "trade" or "commerce" in as defined by the CPA.

142. The Washington Consumer Protection Act, RCW §§ 19.86.020, et seq. ("CPA"), makes it unlawful to commit "[u]fair or deceptive practices in the conduct of any trade or commerce…"

143. For the reasons discussed herein, Defendants violated and continues to violate the CPA by engaging in the herein described unconscionable, deceptive, unfair acts or practices proscribed by CPA RCW §§ 19.86.020 et seq. Defendants' acts and practices, including their material omissions, described herein, were likely to, and did in fact, deceive, and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

144. Defendants repeatedly advertised, both on the labels for the Products, on their websites, and through a national advertising campaign, among other items, that the Products were and are safe and healthy for infant and child consumption. Defendants failed to disclose the material information that the Products contained unsafe levels of toxic heavy metals.

145. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase the Products without being aware that the Products contained unsafe levels of toxic heavy metals. As a direct and proximate result of Defendants' unfair and deceptive acts or practices, Plaintiff Lovincey and Washington Subclass Members suffered damages by purchasing the Products because they would not have purchased the Products had they known the truth, they paid a price premium for products that were actually worth less than what they paid for, and they ultimately received products that were worthless because they contain unsafe levels of toxic heavy metals.

146. Plaintiff Lovincey would not have purchased the Products at the premium price she did if she had known that the Products contained elevated level of toxic heavy metals which were material to a reasonable consumer acting

147. Defendants' deceptive trade practices caused injury in fact and actual damages to Plaintiff Lovincey and Washington Subclass Members in the form of the payment of the price premium. In addition, such injury is present in the form of the loss or diminishment of value of the Products Plaintiff Lovincey and Washington Subclass Members purchased, which allowed Defendants to profit at the expense of Plaintiff Lovincey and Washington Subclass Members. The injuries to Lovincey and Washington Subclass Members were to legally protected interests. The gravity of the harm of Defendants' actions is significant and there is no corresponding benefit to consumers of such conduct.

148. Plaintiff Lovincey and Washington Subclass Members seek relief for the injuries they have suffered as a result of Defendants' unfair and deceptive acts and practices, as provided by CPA and applicable law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully requests that this Court:

A. Certify the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Name Plaintiffs as Class Representatives of the Classes;

C. Name Plaintiffs' counsel as Class Counsel for the Classes;

D. Award damages, including compensatory, exemplary, and statutory damages, to Plaintiff and the Classes in an amount to be determined at trial;

E. Permanently enjoin Defendants from engaging in the wrongful and unlawful conduct alleged herein;

F. Award Plaintiffs and the Class Members their expenses and costs of suit, including reasonable attorneys' fees to the extent provided by law;

G. Award Plaintiffs and the Class Members pre-judgment and post-judgment interest at the highest legal rate to the extent provided by law; and

H. Award such further relief as the Court deems appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated: July 30, 2024

Respectfully submitted,

*/s/ Terence R. Coates*
Terence R. Coates (0085579)
Dylan J. Gould (0097954)
**MARKOVITS, STOCK & DEMARCO, LLC**
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700
Facsimile: (513) 665-0219
tcoates@msdlegal.com
dgould@msdlegal.com

**MIGLIACCIO & RATHOD LLP**
Nicholas A. Migliaccio (*pro hac vice*)
nmigliaccio@classlawdc.com
Jason S. Rathod *
jrathod@classlawdc.com
Mark D. Patronella *
mpatronella@classlawdc.com
412 H Street NE, Suite 302
Washington, D.C. 20002
Tel: (202) 470-3520

**KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.**
Gary Graifman (*pro hac vice*)
ggraifman@kgglaw.com
Melissa R. Emert (*pro hac vice*)
memert@kgglaw.com
135 Chestnut Ridge Road, Suite 200
Montvale, NJ 07645
Tel: (845) 356-2570
F: (845) 356-4335

*Counsel for Plaintiffs and the Proposed Class*

* *pro hac vice* admission to be sought