## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**TASHEBA BARNETT, et al.,**

      **Plaintiffs,**

                             **Case No. 1:22-cv-544**

    **v.**

                             **JUDGE DOUGLAS R. COLE**

**THE KROGER COMPANY, et al.,**

      **Defendants.**

### OPINION AND ORDER

This case seeks to impose liability on Defendants The Kroger Company, Fred Meyer, Inc., Harris Teeter Supermarkets, Inc., and Harris Teeter, LLC (the Grocery Stores) for their involvement in selling "Simple Truth Organic Rice Rusks Baby Teething Wafers" (the Product), which Plaintiffs allege contain elevated levels of toxic metals. But the case is experiencing some teething pains of its own. In the more than two years since Plaintiffs filed the case, it has yet to move beyond the motion-to-dismiss stage. That is not for lack of effort. The case is currently on its fourth motion to dismiss, with the current motion directed at the Second Amended Complaint. For the reasons explained below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' most recent motion (Doc. 48), and hopes that will mark the end of this phase of the case.

### BACKGROUND

Plaintiffs Tasheba Barnett, Adele Hoffman, and Chadaela Lovincey claim that the Product—"Simple Truth Organic Rice Rusks Baby Teething Wafers"—contains

elevated levels of toxic metals. (Second Am. Compl., Doc. 45, #724, 737). They note, for example, that those levels exceed what the Food and Drug Administration (FDA) considers safe when present in adult drinking water. (*See id.* at #734–36).[1] Yet despite the presence of these alleged contaminants, the Product's packaging touts that the wafers are safe and recommended for children "6+ months." (*Id.* at #737–38). Plaintiffs claim that, based on such representations, they purchased these teething wafers and fed them to their children, but that they wouldn't have done so if they had known the Product contained elevated levels of toxic heavy metals. (*Id.* at #738–40).

In Plaintiffs' original Complaint in this putative class action, they asserted six claims: (1) a common-law breach of implied warranty claim (asserted on behalf of all Plaintiffs and a putative nationwide class); (2) a Magnuson-Moss Warranty Act claim (which they voluntarily dismissed, (*see* Doc. 26, #297 n.3)); (3) an unjust enrichment claim (on behalf of all Plaintiffs and a putative nationwide class); (4) a claim under Texas's Deceptive Trade Practices and Consumer Protection Act (TDTPA) (on behalf of Barnett and a putative Texas subclass); (5) a claim under Indiana's Deceptive Consumer Sales Act (IDCSA) (on behalf of Hoffman and a putative Indiana subclass); and (6) a claim under Washington's Consumer Protection Act (WCPA) (on behalf of Lovincey and a putative Washington subclass). (Compl., Doc. 1, #16–25).

When the Grocery Stores moved to dismiss (the first time around), (Doc. 19), the Court granted the motion, dismissing Plaintiffs' original Complaint without

---

[1] As noted in the Court's previous Opinion and Order, according to the results of an independent lab study attached to Plaintiffs' Second Amended Complaint, the levels of mercury were within allowable FDA limits. (Doc. 39, #601 n.1; *see also* Doc. 45-1, #757).

prejudice, (Op. & Order, Doc. 25). Specifically, the Court found that Plaintiffs failed to state plausible common-law claims or state-specific (i.e., Texas, Indiana, or Washington) consumer protection law claims. (*Id.* at #283–89). Notably, though, the Court rejected the Grocery Stores' argument that the FDA has primary jurisdiction over baby food safety and did not reach the Grocery Stores' argument that Plaintiffs lacked standing.[2] (Doc. 25, #281–83, 289 n.2).

In response, Plaintiffs filed an Amended Complaint seeking to cure the deficiencies that had led to dismissal. (Doc. 28). But the Grocery Stores once again moved to dismiss. (Doc. 31). In that motion (the second), they re-raised the arguments that the Court had rejected (i.e., primary jurisdiction) or not reached (e.g., standing) on the first go-round, and further argued that Plaintiffs' Amended Complaint did not fix the problems the Court had identified in the initial Complaint. (*See generally id.*).

The Court ultimately denied the Grocery Stores' motion. (Op. & Order, Doc. 39). On the standing front, the Court rejected the Grocery Stores' argument that the alleged injury, which was purely economic, was not sufficiently concrete to count for Article III purposes. (*Id.* at #604–12). And the Court then reasserted its view that the FDA did not have primary jurisdiction. (*Id.* #612 n.7). Turning to the merits of Plaintiffs' claims, the Court determined they had plausibly alleged violations of the

---

[2] As standing is a jurisdictional prerequisite, the Court typically would have started there. But because the Court concluded it was dismissing the case without prejudice—the same result that would follow if standing were lacking—it determined that it could proceed without doing so at the time.

state-specific consumer protection laws, and so rejected the Grocery Stores' request to dismiss those claims. (*Id.* at #615–19).

As for the common-law claims (for breach of implied warranty and unjust enrichment), though, the story was slightly different. Ultimately, the result was the same—the Court denied the Grocery Stores' motion. But it did so only because the Court was unclear which law (Ohio, Texas, Indiana, or Washington) applied to those claims. (*Id.* at #612–14). In other words, the Court couldn't determine whether Plaintiffs had or had not plausibly alleged their common-law claims because the parties had not addressed which state's (or states') law(s) governed. (*Id.*). As the Court acknowledged, though, the parties' failure to brief that issue largely resulted from poor directions the Court had provided in its previous dismissal order. (*Id.* at #613). So the Court clarified that the Grocery Stores could renew their motion to dismiss Plaintiffs' two common-law claims—this time addressing the whose-law-controls issue, and explaining why, under that law (or laws), Plaintiffs failed to plausibly allege their common-law claims. (*Id.*).

The Grocery Stores took the Court up on that offer. On June 5, 2024, they filed a third motion to dismiss, this time directing their arguments toward the common-law claims and the choice-of-law issue. (Doc. 41). But before that motion became ripe, Plaintiffs filed a Second Amended Complaint, (Doc. 45), which mooted the Grocery Stores' June 5, 2024, motion. (*See* 8/5/24 Not. Order).

Undeterred, the Grocery Stores fired out yet another motion to dismiss—the one at issue here. (Doc. 48). Beyond renewing their already-once-rejected arguments

related to primary jurisdiction, standing, and the state-specific consumer protection laws,[3] the Grocery Stores press three arguments. (*Id.*). First, they claim that Plaintiffs' Second Amended Complaint engages in impermissible "shotgun pleading," and that the Court should thus dismiss it in its entirety. (*Id.* at #773–75). Second, they say that Plaintiffs cannot bring their common-law claims under Ohio law since none reside here. (*Id.* at #775, 782). Finally, they attack the plausibility of Plaintiffs' two common-law claims, arguing that under any of the relevant states' laws (Ohio, Texas, Indiana, and Washington), Plaintiffs' claims fail. (*Id.* at #776–84).

The motion is now fully briefed, (Resp., Doc. 49; Reply, Doc. 53), and thus ripe for review.

## LEGAL STANDARD[4]

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must allege "sufficient factual matter … to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). While a "plausible" claim for relief does not require a showing of probable liability, it requires more than "a sheer possibility that a defendant has acted unlawfully." *Id.*

---

[3] The Grocery Stores noted that they were re-presenting these arguments simply to avoid any claim that they had failed to preserve them. (Doc. 48, #773). The Court has no objection to them doing so, but declines to further re-address those issues in this Opinion and Order, instead relying on its previous determinations.

[4] The Grocery Stores ask the Court to take judicial notice of various FDA statements available on public websites. (Doc. 48, #770–71 n.3–8). Courts can take judicial notice of facts not reasonably subject to dispute, such as those found on government websites. *See City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 655 n.1 (6th Cir. 2005). Here, the statements to which the Grocery Stores point are all found on FDA's official website in official documents. Beyond that, Plaintiffs did not object to the Court's consideration of these statements. So the Court can properly consider them at this stage. *Id.*

The complaint must allege sufficient facts to allow the Court "to draw the reasonable inference that the defendant is liable." *Id.*

At the motion-to-dismiss stage, in assessing plausibility, the Court "must accept the complaint's well-pleaded factual allegations as true." *Lewis v. Acuity Real Est. Servs., LLC,* 63 F.4th 1114, 1116 (6th Cir. 2023); *Iqbal,* 556 U.S. at 678. And the Court must "draw all reasonable inferences" in the plaintiff's favor. *Marchek v. United Servs. Auto. Ass'n,* 118 F.4th 830, 833 (6th Cir. 2024). But that does not mean the Court must take everything the plaintiff alleges at face value, no matter how unsupported. Rather, the Court may disregard "naked assertions" of fact or "formulaic recitations of the elements of a cause of action." *Iqbal,* 556 U.S. at 678 (cleaned up).

## LAW AND ANALYSIS

As noted, the Grocery Stores' motion first attacks the entirety of Plaintiffs' Second Amended Complaint by arguing that it amounts to impermissible "shotgun pleading." It then directs a narrower attack on Plaintiffs' two common-law claims, arguing that Plaintiffs failed to plausibly allege them. The Court considers the broader argument first and the narrower ones second, with a word on choice of law in between.

### A.   Plaintiffs Did Not Engage in Impermissible Shotgun Pleading.

The Grocery Stores argue for dismissing Plaintiffs' entire Second Amended Complaint because they claim it engages in impermissible "shotgun pleading." (Doc. 48, #773–75). That argument suffers from two flaws.

First, in its previous Opinion and Order, the Court said it would allow the Grocery Stores to again seek dismissal of Plaintiffs' two common-law claims, "but only [those] claims." (Doc. 39, #614). The Grocery Stores, however, rely on their shotgun-pleading theory to seek dismissal of the *entire* Second Amended Complaint. (Doc. 48, #773–75; Doc. 53, #884–87). True, they do suggest that because of the "group pleading," Plaintiffs fail to allege a necessary element of their breach of implied warranty and unjust enrichment claims. (*See* Doc. 48, #782–83; Doc. 53, #885). But that argument (which the Court addresses below) goes to whether Plaintiffs plausibly alleged those two common-law claims, not to whether they engaged in impermissible shotgun pleading such that the entire Second Amended Complaint is sullied.

Second problem: The Court isn't convinced that Plaintiffs engaged in impermissible "shotgun pleading." Other circuits have identified several ways in which a complaint can amount to shotgun pleading. *See, e.g.*, *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321–23 (11th Cir. 2015). The essence of each, though, is that the pleading "make[s] it virtually impossible for a defendant to know which allegations of fact are intended to support which claims for relief." *Arnold v. CooperSurgical, Inc.*, 681 F. Supp. 3d 803, 824 (S.D. Ohio 2023) (cleaned up). And in the Sixth Circuit, courts analyze so-called shotgun pleadings by asking "whether the complaint violates the Federal Rules of Civil Procedure." *Id.* (citing *Lee v. Ohio Educ. Ass'n*, 951 F.3d 386, 392 (6th Cir. 2020)). Relevant here, to satisfy Federal Rule of Civil Procedure 8(a)(2), plaintiffs must "connect specific facts" with the "various causes of action [they] asserted" to put the defendants on "adequate notice of the

claims against them and the grounds upon which each claim rests." *Lee*, 951 F.3d at 392–93 (citations omitted).

The Court concludes that Plaintiffs' Second Amended Complaint meets Rule 8(a)(2)'s requirements. Plaintiffs allege that each Grocery Store is either a distributor or direct seller of the teething wafers, (Doc. 45, #727–28), which shows that they were each involved in the supply chain and explains why Plaintiffs asserted each claim against them. *See Arnold*, 681 F. Supp. 3d at 825 (finding no shotgun pleading where the complaint "allege[d] all claims against all defendants due to the defendants' allegedly intertwined business relationships and the intertwined facts in the case"). And Plaintiffs provided specific facts for each cause of action, which notified the Grocery Stores of the grounds supporting each claim against them. (*See* Doc. 45, #740–54). True, after introducing the four Grocery Stores by name in the "Parties" section, (*id.* at #727–28), the Second Amended Complaint refers to them collectively rather than acknowledging them as distinct entities. But that, by itself, doesn't make it "virtually impossible" for the Grocery Stores to understand which claims Plaintiffs mean to assert against each individual Grocery Store or which factual allegations support those claims. So the Court concludes that Plaintiffs did not engage in impermissible "shotgun pleading." Of course, as the case moves forward, it will be incumbent on Plaintiffs to develop specific facts relating to each Grocery Store's alleged involvement, and why that involvement should create liability. But the Second Amended Complaint suffices to put each Grocery Store on notice of the general nature of the claims against it.

**B.    Choice of Law**

With that out of the way, the Court turns to a closer look at the two common-law claims on which it invited further briefing. Before considering the sufficiency of those claims, though, the Court offers a word on choice of law. As noted in the previous Opinion and Order, choice of law is "not a pleading requirement." (Doc. 39, #613). That said, knowing which law does (or might) apply allows the Court to determine (1) what elements Plaintiffs must plead to state their claim, and (2) whether Plaintiffs have alleged facts that plausibly establish each element such that they've stated a viable claim under *Iqbal*/*Twombly*.

In the Second Amended Complaint, Plaintiffs assert two common-law claims—breach of implied warranty and unjust enrichment—each under Ohio common law on behalf of a putative nationwide class. (Doc. 45, #740, 743). But Plaintiffs alternatively bring these claims under Indiana, Texas, and Washington law on behalf of putative subclasses for each state (with one of the three named Plaintiffs being a citizen of each of those states). (*Id.* at #742–44).

The Grocery Stores argue that Plaintiffs cannot assert claims based on Ohio law because none reside in Ohio. (Doc. 48, #775). They correctly note that the Court, sitting in diversity, "must apply the choice-of-law rules of the forum state." (Doc. 48, #775 (citing *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 366 (6th Cir. 2022)). Here, that's Ohio. And they say that under Ohio's choice-of-law rules, the law of the state where the injury arose generally controls. (*Id.* (citing *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946 (6th Cir. 2011)). According to the Grocery Stores, Plaintiffs' injuries arose where they bought the Product—that is, in Texas

(Barnett), Indiana (Hoffman), and Washington (Lovincey)—so Ohio law cannot apply. (Doc. 48, #775).[5]

Plaintiffs, for their part, argue that the Court need not undertake a choice-of-law analysis because there is no conflict among Ohio's, Texas's, Indiana's, and Washington's implied warranty or unjust enrichment laws. (Doc. 49, #837–38, 845–47). And because no conflict exists, the Court can simply apply Ohio law to each claim. (*Id.*).

So which law should the Court apply? And does it even have to make a choice-of-law determination at this time? Ultimately, the Court, at least for present purposes, determines that it's best to analyze Plaintiffs' implied warranty claim under Texas, Indiana, and Washington law, respectively, and the unjust enrichment claim under Ohio law. Beyond that, the Court will defer making a definitive choice-of-law determination until a later stage of litigation. Here's why.

Start with the implied warranty claim. To their credit, the Grocery Stores may well be right that Plaintiffs cannot assert their claims under Ohio law—either because their injuries did not arise here, or because the contract under which they purchased the Product was not created or performed here. But as noted, Plaintiffs

---

[5] The Court agrees with the Grocery Stores that it must apply Ohio's—the forum state's—choice-of-law rules. And it also agrees that, as discussed in *Pilgrim*, Ohio courts generally apply the law of the state where the injury arose to tort or consumer protection claims. *Pilgrim*, 660 F.3d at 946. But, as explained more below, if Plaintiffs are bringing their breach of implied warranty claim in contract (rather than in tort), then the law of the state where the contract was executed would govern. *Albright v. Sherwin-Williams Co.*, No. 1:17-cv-2513, 2019 WL 5307068, at *2 (N.D. Ohio Jan. 29, 2019) (referencing Restatement (Second) of Conflict of Laws § 188 (1971) and citing *Ohayon v. Safeco Ins. Co. of Ill.*, 747 N.E.2d 206, 211–12 (Ohio 2001)). In all likelihood, that is the same place Plaintiffs' injuries arose. The Court simply notes that the choice-of-law analysis differs between tort and contract claims.

bring their claims, in the alternative, under Texas, Indiana, and Washington law. And since all parties agree that Plaintiffs reside in those states, it makes sense that their injuries arose there (or their contracts were executed and performed there). So the Court can look to *those* laws to determine whether Plaintiffs have plausibly alleged their claims. In other words, the Court need not determine now whether Ohio law might apply to putative class members' claims since no class yet exists. True, as the Court previously noted, choice-of-law issues may impact class certification.[6] (*See* Doc. 39, #614). But for now, Plaintiffs have done enough show the Court why it should look to Texas, Indiana, and Washington law to determine the sufficiency of the implied warranty claims they press.

---

[6] The Grocery Stores argue that Plaintiffs lack standing to "pursue claims on behalf of putative class members whose claims arose in states other than Texas, Indiana, or Washington." (Doc. 48, #781–82). That argument, however, conflates two distinct (albeit muddled) concepts of "standing": "one focuse[s] on what the Constitution requires, and the other focuse[s] on who has been substantively authorized to bring a claim." *Generation Changers Church v. Church Mut. Ins. Co.*, 693 F. Supp. 3d 795, 804 (M.D. Tenn. 2023). The Court already determined that Plaintiffs have standing in the constitutional sense (although it has more to say on that front below). (Doc. 39, #604–12). Now, the Grocery Stores contest Plaintiffs' standing in the second sense—i.e., whether they're authorized to bring claims on behalf of class members from other states. But as the *Generation Changers* court aptly explained, Federal Rule of Procedure 23's text "strongly suggests" that a plaintiff from one state can represent other plaintiffs whose claims arise under the laws of different states. 693 F. Supp. 3d at 805. Several circuit courts have also suggested as much. *Id.* at 805–06 (collecting cases). And while it's true that various district courts have disagreed and dismissed putative class-action claims at the motion-to-dismiss stage for lack of "standing," *id.* at 806 (collecting cases), the Court is not persuaded that the Federal Rules of Civil Procedure (or the Constitution) demand such a result. To be sure, under Rule 23, a court must consider, for example, whether a class action is the superior mechanism to adjudicate claims based on violations of many state's laws, and whether a named plaintiff can adequately represent absent class members' claims. But those considerations seem better suited for the class-certification stage, not the motion-to-dismiss stage. *See id.* at 806–07. So the Court opts to address the Grocery Stores' "standing" argument if and when Plaintiffs seek class certification. *See Johnson v. FCA US LLC*, 555 F. Supp. 3d 488, 496–99 (E.D. Mich. 2021) (explaining that this approach appears to be "consistent" with the Sixth Circuit's "two most relevant," though not dispositive, decisions on the subject).

As for Plaintiffs' contention that Ohio's, Texas's, Indiana's, and Washington's laws relating to implied warranty are "virtually identical," the Court is dubious. Plaintiffs' entire argument is that breach of warranty issues are "governed by identical [Uniform Commercial Code (U.C.C.)] provisions adopted by every state," so there is no conflict to resolve among each state's laws. (Doc. 49, #837–38 (citing *Albright v. Sherwin-Williams Co.*, No. 1:17-cv-2513, 2019 WL 5307068, at *17 (N.D. Ohio Jan. 29, 2019))). The Court, however, notes two problems. First, Plaintiffs' Second Amended Complaint makes no mention of the U.C.C. Rather, it brings the breach of implied warranty claim under Ohio common law. (Doc. 45, #740–41). That distinction could matter because in Ohio a plaintiff can bring an implied warranty claim in contract or in tort. The former "arises pursuant to the law of sales codified in Ohio's [U.C.C.]" and requires privity between the parties. *Wotring Towing v. Ford Motor Co.*, No. 2:16-cv-1193, 2017 WL 2378003, at *2 (S.D. Ohio May 31, 2017) (citation omitted). But the latter "is a common law cause of action that imposes liability" where a product is not merchantable or otherwise "fit and safe for its ordinary intended use" and does not require privity between the parties. *Id.* (citation omitted). In other words, the theory—contract or tort—underlying Plaintiffs' claim dictates whether they must plausibly plead privity to survive a motion to dismiss, at least under Ohio law. And the Court isn't clear which one Plaintiffs are asserting here.[7]

---

[7] That said, if the Plaintiffs are proceeding on a tort theory, another problem lurks. Their only claimed injury is economic. While economic damages are recoverable in contract, they

Second, and somewhat relatedly, even if Ohio, Texas, Indiana, and Washington have adopted the same U.C.C. provision for breach of implied warranty, the Court isn't convinced that those states *apply* that provision in the same way. *See Powers v. Lycoming Engines*, 272 F.R.D. 414, 420 (E.D. Pa. 2011). For example, Ohio and Washington seemingly require privity to bring an implied warranty claim under their versions of the U.C.C., while Texas and Indiana do not. *Compare Curl v. Volkswagen of Am., Inc.*, 871 N.E.2d 1141, 1147–48 (Ohio 2007), *and Lohr v. Nissan N. Am., Inc.*, No. 16-1023, 2017 WL 1037555, at *7 (W.D. Wash. Mar. 17, 2017), *with Nobility Homes of Tex., Inc. v. Shivers*, 557 S.W.2d 77, 81 (Tex. 1977), *and Hyundai Motor Am., Inc. v. Goodin*, 822 N.E.2d 947, 958–59 (Ind. 2005). That could matter, as Plaintiffs do not allege any direct interaction with at least two of the Defendants: Harris Teeter, LLC (Harris Teeter), and Harris Teeter Supermarkets, Inc. (Harris Teeter Supermarkets).[8] And beyond privity, states differ in how they handle defenses, disclaimers, and notice. *See Powers*, 272 F.R.D. at 427–30 (outlining the states' various approaches to implied warranty claims). In short, the Court is not comfortable concluding that the four states' versions of the U.C.C. are the same for conflict-of-law purposes, especially when the parties have not bothered to address those potentially significant differences in their briefing. For those reasons, the Court

---

generally are not recoverable in tort absent physical injury, which Plaintiffs do not claim. *See, e.g., Campbell v. Krupp*, 961 N.E.2d 205, 211 (Ohio Ct. App. 2011).

[8] The Court will refer to Harris Teeter and Harris Teeter Supermarkets collectively as "the Harris Teeter Defendants."

will assess whether Plaintiffs have alleged plausible implied warranty claims under Texas, Indiana, and Washington law at this juncture.

Now consider the unjust enrichment claim. The Grocery Stores concede that Ohio, Texas, Indiana, and Washington law impose the same standard to establish unjust enrichment: That the plaintiff conferred a benefit on the defendant that would be inequitable for the defendant to retain. (Doc. 48, #782 (citing cases from each state)). The Court agrees. *Hawes v. Macy's Inc.*, No. 1:17-cv-754, 2023 WL 8811499, at *7 (S.D. Ohio Dec. 20, 2023). And because Ohio (and most other states) do not require a choice-of-law analysis where the potentially applicable laws do not conflict, *id.* at *6, it doesn't matter which of those four states' laws applies. Nor does that create a constitutional problem. When no conflict exists, "the Constitution does not prohibit the application of [a] state's law extraterritorially." *Id.* (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816 (1985)). Ultimately, then, as long as Plaintiffs have plausibly alleged unjust enrichment under Ohio law (which parallels Texas, Indiana, and Washington law), their unjust enrichment claim can proceed.

In short, the Court will analyze Plaintiffs' implied warranty claim under Texas, Indiana, and Washington law, and it will analyze the unjust enrichment claim under Ohio law. But in adopting that approach, the Court stresses that it intends to revisit choice-of-law issues at the class-certification stage. True, the Court *could* perhaps conduct a definitive choice-of-law analysis now, rather than waiting until class certification (should Plaintiffs seek certification). *Lunkenheimer Co. v. Pentair Flow Control Pac. PTY Ltd.*, No. 1:11-cv-824, 2014 WL 4450034, at *4 (S.D. Ohio Sept. 10,

2014); *Foise v. Worcester Polytechnic Inst.*, 967 F.3d 27, 42–43 (1st Cir. 2020). But given the parties', particularly Plaintiffs', less-than-comprehensive briefing on (1) which state's law should apply, and (2) whether an actual conflict exists among Ohio, Texas, Indiana, or Washington law such that the Court must engage in a full-blown choice-of-law analysis, the Court concludes that it's more appropriate to defer that determination.

With that sorted, the Court now turns to the merits of Plaintiffs' two common-law claims. It starts with breach of implied warranty and then turns to Plaintiffs' unjust enrichment claim.

## C.    Implied Warranty of Merchantability

Plaintiffs first assert a breach of implied warranty of merchantability claim. They allege that because the Product contained toxic heavy metals, it was not fit for its ordinary purpose—which they claim is nourishing infants—and thus not merchantable. (Doc. 45, #740–43). The Grocery Stores disagree and argue for dismissal on two fronts: (1) Plaintiffs' Second Amended Complaint fails to identify which Grocery Stores allegedly extended warranties to Plaintiffs, and (2) Plaintiffs have failed to plausibly allege that the Product was unmerchantable. The Court takes each in turn.

### 1.    Plaintiffs Failed to Allege That the Harris Teeter Defendants Extended Any Warranties to Them.

As noted earlier, the Grocery Stores object to Plaintiffs' so-called "shotgun pleading," claiming that it runs afoul Rule 8(a)(2)'s pleading requirement. While (as already explained) the Court isn't persuaded that the Second Amended Complaint

violates Rule 8(a)(2), Plaintiffs' decision to collectively plead liability does create problems when it comes to adequately stating a claim under Rule 12(b)(6). As the Grocery Stores highlight, (Doc. 53, #885), Plaintiffs only say they bought the Product directly from The Kroger Company (Kroger) and Fred Meyer, Inc. (Fred Meyer). (Doc. 45, #738–40). In other words, Plaintiffs failed to allege any facts suggesting that any of them purchased the Product from the Harris Teeter Defendants.

That failure dooms Plaintiffs' implied warranty claim as to those two Defendants under any of the three states' laws. As explained above, in Washington, a party asserting breach of an implied warranty must plead privity, and no sale means no privity. Moreover, even though Texas and Indiana have relaxed the privity requirement—in that they allow plaintiffs to sue upstream distributors along with the direct seller—here, Plaintiffs have failed to allege any facts suggesting that they meet even that relaxed privity requirement regarding the Harris Teeter Defendants. In short, to *breach* an implied warranty, a defendant must have *extended* an implied warranty. And Plaintiffs did not allege facts suggesting that the Harris Teeter Defendants extended any warranties to them.

True, the Second Amended Complaint does allege that "Harris Teeter Supermarkets … sells the Products directly" to *other* consumers and that "Defendants distributed or sold its Products to Class Members." (*Id.* at #728, 741). But that does not save Plaintiffs' implied warranty claim against the Harris Teeter Defendants. In fact, it raises a more fundamental issue (and one the parties did not invoke, at least in this specific manner): standing. The Sixth Circuit has made clear

16

that named plaintiffs cannot advance class-action claims against defendants who did not injure them. *Fox v. Saginaw Cnty., Mich.*, 67 F.4th 284, 293–94 (6th Cir. 2023). Rather, "class representatives must prove their own case or controversy with the defendants in order to seek relief for any other member of the class." *Id.* at 294 (cleaned up). Here, then, Plaintiffs must establish *their own* standing to sue all four Grocery Stores. *Id.* at 293–94 (adopting the rule that "named plaintiffs must have standing to sue every defendant at the outset, even when they seek to certify a class"). That, in turn, requires them to show that any economic injury they allegedly suffered is "fairly traceable" to each Grocery Store. *Id.* at 293. And in making that showing, they "cannot piggyback off the injuries suffered by other, unidentified members of the class." *Id.* at 294 (cleaned up).

Here, Plaintiffs seem to engage in just such impermissible piggybacking. They point to injuries that the Harris Teeter Defendants supposedly caused unidentified putative class members. That doesn't work. Plaintiffs "may not seek relief against [the Harris Teeter Defendants for] conduct that has harmed other [putative] class members even [though] it is 'similar' to [Kroger's and Fred Meyer's] conduct that harmed [them]." *Id.* (citation omitted). Said differently, because Plaintiffs do not allege that they purchased the Product from either Harris Teeter Defendant, those entities did not economically harm Plaintiffs; it matters not whether the Harris Teeter Defendants distributed or sold the Product to putative class members. *See id.* at 295 (explaining that the district court, prior to class certification, could not rely on putative class members' injuries because they were not yet parties to the action); *cf.*

*Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011) (explaining that class members are not parties before class certification). All told, because Plaintiffs "have not alleged a basis on which [the Harris Teeter Defendants] extended any warranties to them with respect to the Products," (Doc. 53, #885), the implied warranty claim fails as against the Harris Teeter Defendants.[9]

### 2. Plaintiffs Plausibly Allege That the Product Is Unmerchantable Under Each Relevant State's Law.

Despite Plaintiffs' inability to sue the Harris Teeter Defendants on an implied warranty theory, they have alleged privity with Kroger and Fred Meyer. (Doc. 45, #738–40). So the Court next considers whether Plaintiffs plausibly alleged that the Product was unmerchantable under Texas, Indiana, and Washington law.

### a. Texas

Start with Texas. To state a claim for breach of the implied warranty of merchantability a plaintiff must allege that (1) "the defendant sold or leased a product to the plaintiff;" (2) "the product was unmerchantable;" (3) "the plaintiff notified the defendant of the breach;" and (4) "the plaintiff suffered injury." *Polaris*

---

[9] The Court further observes that this latter holding may have implications for the viability of the consumer protection claims against the Harris Teeter Defendants. The bottom line is that it appears Plaintiffs have failed to allege any facts suggesting that the Harris Teeter Defendants harmed them in any way. That means the Second Amended Complaint fails to plausibly allege standing as to those Defendants, which would be fatal to *all* of the Plaintiffs' claims against those Defendants, not just the common-law warranty claims. While the Grocery Stores previously raised a standing argument, (*see, e.g.,* Doc. 31), it was solely directed at the nature of the alleged injury, and did not differentiate among Defendants. So the Court had yet to consider this defendant-specific standing problem. That said, subject-matter jurisdiction is non-waivable, so the failure to raise this argument earlier would not preclude consideration of it in the future. Given that the issue is not currently briefed and before the Court, however, the Court declines to say more here.

*Indus., Inc. v. McDonald*, 119 S.W.3d 331, 336 (Tex. App. 2003); *see also Equistar Chems., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 867 (Tex. 2007). And the plaintiff must further allege a "defect … that renders [the product] unfit for the ordinary purposes for which [it is] used because of a lack of something necessary for adequacy." *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 444 (Tex. 1989) (cleaned up). In the context of food and drink, a product breaches the implied warranty if it is "unfit for human consumption." *Ayala v. Bartolome*, 940 S.W.2d 727, 729 (Tex. App. 1997); *Sweeney v. Cain*, 243 S.W.2d 874, 875 (Tex. Civ. App. 1951). Texas courts consider unsafe foods unfit. *See, e.g.*, *Ayala*, 940 S.W.2d at 730.

The parties' dispute focuses on the second element—whether Plaintiffs have plausibly alleged that the Product was unmerchantable—so the Court likewise devotes its efforts there. In doing so, the Court freely admits that this is a difficult question. Determining whether Plaintiffs have plausibly alleged that the Product is unmerchantable requires the Court first to determine the contours of "merchantability," and then to ascertain whether Plaintiffs have alleged facts giving rise to a reasonable inference that the Product transgresses those boundaries. Most of the difficulty here resides at the first step. What obligation does the implied warranty of merchantability actually impose upon merchants at a granular level?

The basic notion of an implied warranty of merchantability arose long ago as part of a judicial response to concerns that the caveat emptor doctrine left consumers overly exposed to unsafe goods. *See, e.g.*, *Howard & Ryckman v. Hoey*, 23 Wend. 350, 352–53 (N.Y. Sup. Ct. 1840). The doctrine (at least to the extent that Plaintiffs are

relying on a contract theory to pursue it) now finds its home in the language of the U.C.C. itself. Specifically, U.C.C. § 2-314 first announces a default rule that includes such a warranty in all sales of goods, and then it goes on to describe what characteristics a good must exhibit to be "merchantable":

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of a fair and average quality with the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promise of affirmations of fact made on the container or label, if any.

U.C.C. § 2-314(2). Texas has adopted that provision verbatim.[10] Texas Bus. & Com. Code § 2.314.

The Plaintiffs seem to rely largely on the "fit for the ordinary purpose" part of that definition. But that creates almost as many questions as it answers. That is because the parties don't agree on what the ordinary purpose of the wafers even is, let alone how to assess whether the wafers were "fit" for that purpose. Plaintiffs say the Court should look to whether the Product "provide[d] reasonably safe nourishment to infants," (Doc. 49, #840), suggesting they believe that is the "ordinary

---

[10] So too have Indiana and Washington. Ind. Code § 26-1-2-314; Wash. Rev. Code § 62A.2-314.

purpose" of such wafers. Under that view, they argue that the Product contains elevated levels of heavy metals (as compared to FDA standards for drinking water), which may cause long-term, negative health effects in infants, rendering the wafers unsafe and unmerchantable. (*Id.* at #838–39). The Grocery Stores take a slightly different tack, saying the inquiry is whether the Product was "unfit for human consumption." (Doc. 48, #778–79; Doc. 53, #887). And they measure "fitness" based on whether the Product allegedly gives rise to any immediate health effects like digestion issues, choking, or other illnesses. (*See* Doc. 48, #779). As the Amended Complaint alleges no such effects, they argue that the wafers were not, in fact, unfit for consumption. (*Id.*).

Based on the current record, the Court is not convinced that it can identify, at this juncture, either the "ordinary purpose" of the wafers, or what it means to be "fit" for that purpose. One could imagine, for example, that the ordinary purpose of these wafers is to soothe teething pain (they are, after all, called teething wafers), rather than to "provide reasonably safe nourishment," as Plaintiffs suggest. But even then, the wafers would presumably need to do so in a reasonably safe fashion from a consumption standpoint—indeed, teething wafers made of poison would likely be unfit for their ordinary purpose (however understood), even if they eased an infant's teething pain before causing harm. And relatedly, as to the second question, the Court is not yet ready to decide whether "fitness" speaks only to short-terms effects (for example, choking) as Defendants suggest, or whether long-term safety considerations are also properly part of assessing "fitness."

21

Plus, the Court has other questions. For example, there is at least some caselaw suggesting that, where the safety issue arises from an inherent aspect of the product—like salmonella in chicken—such dangers *cannot* make a product "unmerchantable." *See Starr Surplus Lines Ins. Co. v. Mountaire Farms Inc.*, No. 2:18-cv-67, 2018 WL 3676839, at *3 (D. Me. Aug. 2, 2018), *aff'd*, 920 F.3d 111 (1st Cir. 2019) (noting that "it is commonly known that Salmonella occurs naturally in chicken" when considering the plaintiff's breach of implied warranty of merchantability claim). And if that principle forms part of the legal framework for assessing merchantability, then Defendants' suggestion that heavy metals are an inherent and unavoidable characteristic of the Product may also impact the analysis (though whether that is true as a factual matter is an issue the Court cannot decide at the motion-to-dismiss stage).

In short, without some additional factual development about "ordinary purposes," and additional factual and legal development about the exact contours of "fitness" (and how the Product does, or does not, clear that hurdle), the Court cannot definitively address either aspect of the implied warranty. Still, the Court must decide the pending motion to dismiss. On that front, and mindful that (1) the Court must "draw all reasonable inferences" in Plaintiffs' favor, *Iqbal*, 556 U.S. at 678, and (2) the hurdle is only "plausibility," *id.*, the Court concludes that the best path here is to take a relatively broad reading (at least for current purposes) of both what the "ordinary purpose" is, and what a plaintiff ultimately must show to establish that products are not "fit" for that purpose. Adopting that approach, the Court accepts for

22

now that the "ordinary purpose" of these wafers is to provide nourishment to infants, and that they are "fit" for that purpose if they do so in a reasonably safe manner.

Measured against that benchmark, Plaintiffs have plausibly alleged that the Product is unmerchantable, if barely. In fact, the Court already said as much in its previous Opinion and Order:

> Plaintiff Barnett *does* argue that the wafers contained elevated levels of toxic metals—levels which the FDA considers unsafe in drinking water. At the motion-to-dismiss stage, the Court is required to accept this allegation as true. And that allegation makes it at least *plausible* that the Product is unsafe.

(Doc. 39, #615 (cleaned up)). The same goes for Plaintiffs Hoffman and Lovincey. They collectively submitted independent laboratory testing that shows the Product's arsenic, cadmium, and lead levels exceeded FDA limits for adult drinking water. (Doc. 45, #733–37). That makes it at least *plausible*, which again is all that matters for present purposes, that long-term, negative health effects may arise from exposure to these levels of heavy metals, in turn making it at least *plausible* that the Product is not "fit" to nourish infants, thereby violating the implied warranty of merchantability (interpreted as set forth above).

At the same time, the Court acknowledges that the Grocery Stores' position is not entirely devoid of merit. They rightly point out that there are currently no federal limits for safe levels of heavy metals in baby food products. (Doc. 48, #776). And they correctly highlight that, according to the FDA's own statement, heavy metals—which are "naturally occurring" and thus innate in the soil, water, and air—likely cannot be eliminated completely from baby food. (*Id.* at #768, 770). So in *proving* (rather than merely pleading) that the Grocery Stores breached the implied warranty of

merchantability, Plaintiffs may need to grapple with the inherent presence of heavy metals in the Product—which is perhaps similar to the inherent presence of salmonella in raw chicken. *Starr Surplus Lines*, 2018 WL 3676839, at *3. In other words, Plaintiffs' implied warranty claim may lose at least some of its bite if *all* teething wafers have the same level of heavy metals as the Product. But for present purposes the Court declines to reach that issue, either on the law or on the facts (i.e., the Court does not currently have a basis for knowing whether the Product's levels of toxic metals are the same as, or different from, other teething wafers).

In sum, given the applicable standard, the Court concludes that Plaintiffs have plausibly alleged a claim for breach of the implied warranty of merchantability under Texas law.

### b.  Indiana

Now turn to Indiana. To state a claim for breach of implied warranty, a plaintiff must allege that (1) the seller is a merchant of goods like the product, and (2) the product was not merchantable, i.e., not "fit for the ordinary purposes for which such [product is] used." *Irmscher Suppliers, Inc. v. Schuler*, 909 N.E.2d 1040, 1048 (Ind. Ct. App. 2009). A product may breach the warranty "if it is defective as the result of an imperfection or dereliction." *Id.* And courts should "liberally construe[]" the warranty in favor of the buyer." *Id.*

Again, the parties focus solely on whether the Product was "merchantable"—the second element. And for the same reasons already articulated (including the command to liberally construe the warranty in Plaintiffs' favor), the Court finds that

Plaintiffs have plausibly alleged that the Product was unfit for infant consumption under Indiana law because of the alleged elevated levels of heavy metals.

The Grocery Stores make two counterarguments. Neither persuade the Court. First, they re-raise their argument that "Plaintiffs have not alleged that there are other similar products that don't contain the same [heavy metals]." (Doc. 48, #780). The Court rejects that argument for the same reasons already discussed.

Beyond that, the Grocery Stores urge that *Hughes v. Chattem, Inc.*, 818 F. Supp. 2d 1112 (S.D. Ind. 2011), shows that Plaintiffs' claim must fail under Indiana law. There, the plaintiffs sued a weight loss supplement manufacturer when they learned the supplement contained hexavalent chromium, which they alleged was a harmful ingredient. *Id.* at 1115. The *Hughes* court admittedly dismissed those plaintiffs' implied warranty claim. *Id.* at 1122. But that case strikes the Court as meaningfully different from the present one. There, it appears that there was at least some question as to whether hexavalent chromium was dangerous in anything other than "large amounts." *Id.* at 1115. And the EPA standard on which that court relied, *id.* at 1115 n.3, allowed for total chromium of 0.1 mg/l, or in other words, 100 micrograms/l of water. *Chromium in Drinking Water*, EPA (last updated Feb. 23, 2024), https://perma.cc/WJW7-CHED. Further, the EPA suggested in that report that exposure to such levels "over many years" may lead to "potential adverse dermatological effects" like "allergic dermatitis" (i.e., a rash). *Id.* So the Court understands why in *Hughes* a claim that the supplements at issue contained "between 1.6 and 3.3 *micrograms*" of the substance (i.e., an amount approximately

one-fiftieth of what would fail the EPA's standard for avoiding rashes if consumed in drinking water for many years) may not have created a plausible inference that the supplements were not "fit" for their "ordinary purpose." *See Hughes*, 818 F. Supp. 2d at 1115 (emphasis added).

By contrast, the materials identified here (heavy metals) have well-known potentially toxic effects. (*See e.g.*, Doc. 45, #735 n.8 (citing an FDA website which states that "lead exposure can seriously harm children's health and development, specifically the brain and nervous system" and that "even low-level chronic exposure can be hazardous over time")). And Plaintiffs allege that the Product exceeded FDA limits for heavy metals in drinking water. (*Id.* at #733–37). Again, the Court acknowledges that this benchmark may not ultimately carry the day—drinking water and teething wafers are distinct goods. And, as noted above, if the heavy metals are an inherent aspect of the Product that cannot be removed, and if they are unlikely to cause meaningful harm at the levels in which they are present in the Product, that may change things. But those are questions for a better-developed factual record. For now, Plaintiffs have inched over the plausibility hurdle, *Hughes* notwithstanding.

### c.   Washington

That leaves Washington. To state a claim for breach of implied warranty of merchantability there, the plaintiff must allege that the product was not "reasonably fit for [its] usual, intended purpose." *Fed. Signal Corp. v. Safety Factors, Inc.*, 886 P.2d 172, 180 (Wash. 1994). A product is "normally" merchantable if it "conforms to the quality of other brands in the market." *Id.* And "merchantable" does not mean

"perfect." *Id.* A product is unmerchantable, by contrast, when it is not "reasonably safe when put to [its] ordinary use and reasonably capable of performing [its] ordinary functions." *Id.* (citation omitted).

As explained, Plaintiffs have plausibly alleged that the Product was not "reasonably safe" because of the elevated heavy metal levels it apparently contained. True, Plaintiffs did not allege that the Product failed to conform to the quality of other teething wafers or baby food brands. But even so, such a comparison only "normally" renders the good merchantable; it's not dispositive of merchantability. And, at the risk of parroting, Plaintiffs did allege that the Product contained heavy metal levels above what the FDA allows in drinking water. Again, perhaps that is not a perfect comparator. But if the FDA has concluded that drinking water that contains such levels of heavy metals are unsafe to ingest, that renders it at least plausible that the same may be true of other foodstuffs. And that means that Plaintiffs have stated a plausible claim that the Product was unmerchantable under Washington law, which is the only question here.

At bottom, plausibility is a relatively low hurdle, and that is by design. There is often an information asymmetry at the outset of litigation—here, for example, the Grocery Stores presumably know much more about the Product than Plaintiffs. Thus, Plaintiffs need not prove they will ultimately prevail to proceed beyond dismissal. That is the purpose of discovery. At this stage, Plaintiffs must merely allege facts that establish something is troublesome enough to warrant a closer look in discovery. The Court, drawing on its "judicial experience and common sense," *Iqbal*, 556 U.S. at

679, concludes Plaintiffs have done that as to their breach of implied warranty claim under each of the three states' laws. That said, the Court also acknowledges that, based on the Grocery Stores' representations about what the facts will show, Plaintiffs may face some uphill sledding down the road.

### D.    Unjust Enrichment

As noted, the Court will analyze the unjust enrichment claim only under Ohio law since Ohio's version does not conflict with Texas, Indiana, or Washington law. To state a claim for unjust enrichment, a plaintiff must allege that (1) a plaintiff conferred a benefit upon a defendant; (2) the defendant knew of the benefit; and (3) it would be unjust for the defendant, under the circumstances, to retain the benefit. *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984). To determine whether it would be unjust for a defendant to retain the benefit, a court must consider whether the plaintiff has a "superior equity" such that it would be "unconscionable for the defendant to retain the benefit." *Longmire v. Danaci*, 155 N.E.3d 1014, 1024 (Ohio Ct. App. 2020) (cleaned up). The Grocery Stores argue that Plaintiffs' unjust enrichment claim fails on elements one and three, so the Court takes each in turn.

Start with the first element. Like before, the Grocery Stores claim that Plaintiffs failed to specifically identify from which Defendant(s) they purchased the Product, and therefore, which Defendant(s) they unjustly enriched. (Doc. 48, #782–83). Not so say Plaintiffs. According to them, the Second Amended Complaint clearly alleges that Barnett and Hoffman bought the Product from Kroger, and Lovincey bought the Product from Fred Meyer. (Doc. 49, #848 (citing Doc. 45, #738–

40)). Their unjust enrichment claims, therefore, "are only alleged against Defendants from whom they bought Products directly." (*Id.*).

Based on that representation, the Court understands Plaintiffs to be asserting their unjust enrichment claim against only Fred Meyer and Kroger. And since the Second Amended Complaint did allege that Plaintiffs directly purchased the Product from those two Defendants, the Court finds that Plaintiffs plausibly alleged the first element of their claim against Fred Meyer and Kroger. But to the extent Plaintiffs seek to allege unjust enrichment against the Harris Teeter Defendants, their claim fails because they did not allege that they directly purchased the Product from those two Defendants.

Now move to element three. The parties' arguments here are reminiscent of their arguments for and against standing (which the Court addressed in its previous Opinion and Order). Plaintiffs say they "would not have purchased the [P]roduct or not purchased it for the price they did" if they knew the Product contained elevated levels of toxic metals, which makes it inequitable for the Grocery Stores to retain the money Plaintiffs did pay. (Doc. 49, #850). In that way, Plaintiffs advance both a fraudulent inducement and a price-premium theory for their alleged economic injury.

As the Court previously explained, under both a fraudulent-inducement theory and a price-premium theory of economic injury, "the cause of the injury is the same[:] reliance on a seller's misrepresentation that was intended to induce a sale." (Doc. 39, #607). Since Plaintiffs allege that the Grocery Stores' representations on the Product's labeling induced them to purchase the Product at their expense—whether

29

for the entire Product price or just the price premium—they have sufficiently alleged that they have "superior equity." (*See* Doc. 45, #743). And that means it's at least plausible that, under the circumstances, allowing the Grocery Stores to retain the purchase price (or price premium) would be unjust.

The Grocery Stores' counterarguments, moreover, are unpersuasive. First, they maintain that, to the extent Plaintiffs argue they would have not purchased the Product at all, Plaintiffs' later-realized dissatisfaction with the Product cannot support an unjust enrichment claim (Doc. 48, # 784; Doc. 53, #895). And they again rely on *Hughes* to support their argument. In *Hughes*, that court dismissed the plaintiffs' unjust enrichment claim because they failed to articulate what wrongful benefit the defendant retained or why an equitable remedy was necessary. 818 F. Supp. 2d at 1124–25.

To be sure, mere dissatisfaction after making a purchase does not give rise to an unjust enrichment claim. (Doc. 39, #611–12). But here Plaintiffs allege more than mere dissatisfaction. Rather, they claim that the Grocery Stores failed to disclose the presence of heavy metals in the Product, and that this non-disclosure both induced their purchase and unjustly deprived them of the benefit of their bargain. (Doc. 45, #743 (alleging that the Grocery Stores mis-label the Product "to gain unfair advantages and reap unearned financial benefits")). Ultimately, then, *Hughes* offers the Grocery Stores no help.

Second, the Grocery Stores contend that if Plaintiffs mean to rely on a "price premium" rationale, that doesn't work either because Plaintiffs failed to identify

"comparable, cheaper, or safer products that demonstrate they paid a premium price." (Doc. 53, #895). But as the Court explained in its previous Opinion and Order, Plaintiffs are not relying exclusively on a price-premium theory, so they "need not allege that they would have purchased an alternative non-premium product." (Doc. 39, #611). They need only allege that they conferred a benefit on the Grocery Stores, which would be inequitable for the Grocery Stores to keep. By alleging that they would not have purchased the Product if the Grocery Stores had disclosed the presence of the heavy metals, Plaintiffs do just that.

## CONCLUSION

For the reasons stated, the Court **GRANTS IN PART** and **DENIES IN PART** the Grocery Stores' Motion to Dismiss Second Amended Complaint (Doc. 48). Specifically, the Court **DISMISSES WITH PREJUDICE** Plaintiffs' breach of implied warranty claim and unjust enrichment claim as against Harris Teeter, LLC, and Harris Teeter Supermarkets, Inc. The Court **DENIES** the Grocery Stores' motion in all other regards.

**SO ORDERED.**

March 5, 2025
_____
**DATE**

_____
**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**